MARY NOACK *vs.* STANDARD STORES, INCORPORATED.

Worcester.   September 26, 1932. — November 5, 1932.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & DONAHUE, JJ.

*Contract,* Validity.   *Deceit.*

Where a representative of a corporation, with intent to induce a woman to purchase shares of its corporate stock, made to her material representations concerning the stock which he knew were false and upon which she relied in purchasing the stock; and at about the same time she paid for the shares, which she later received, and signed a subscription agreement which was not read nor explained to her, nor understood by her, she was not bound by a provision in the agreement that "No condition, agreements or representations, written or verbal, other than those printed herein, shall be binding," nor did such provision bar an action of tort for deceit by her against the corporation.

CONTRACT OR TORT.   Writ dated January 28, 1931.

The action was heard in the Superior Court by *F. T. Hammond,* J., without a jury.   Material facts found by the judge and rulings requested by the defendant and refused by the judge are stated in the opinion.   There was a finding for the plaintiff in the sum of $5,049.60.   The defendant alleged exceptions.

*M. Jacobs,* for the defendant.

*W. C. Mellish,* (*A. W. Mitchell* with him,) for the plaintiff.

CROSBY, J.   This is an action of tort to recover damages for inducing the plaintiff, by false representations, to purchase stock of the defendant.   The case was tried before a judge of the Superior Court without a jury.   It is recited in the bill of exceptions that "the defendant admits that there was evidence which warranted the findings of fact

set forth in the court's 'Statement of Findings and Rulings' so that a recital of evidence is omitted."

The trial judge made the following findings and rulings: The plaintiff and her husband were born in Germany. For several years they worked as weavers. Afterwards they bought a small shoddy mill which the plaintiff's husband ran with the assistance of two employees. The Commonwealth took this mill by right of eminent domain and paid the plaintiff and her husband for it. The plaintiff's husband has a very limited knowledge of the English language. The plaintiff speaks and reads English. Neither she nor her husband ever had any experience in buying stocks or bonds before the transactions herein involved. On March 11, 1930, one Green, employed by the defendant to sell shares of stock in its company, called upon the plaintiff in answer to a letter from her husband who had seen in a newspaper the company's advertisement regarding the sale of its stock and had written for information. In the course of three visits to the plaintiff on successive days, Green induced her to buy five blocks of class A common stock in the defendant company, and went with her to a savings bank, in Worcester, from which she drew and paid to him $1,000 and received a certificate for one thousand shares of class A common stock in the defendant company. A few days later Green called upon the plaintiff again, bringing with him another salesman of the defendant, one Lipsett. They both urged her to buy four thousand additional shares of class A stock. A few days later another salesman, one Sternberg, appeared at the plaintiff's house and urged her to buy the stock. He drove her to Boston by automobile, introduced her to one Goldstein, president of the company, took her to lunch and drove her back to her home. The following day Sternberg again appeared and the plaintiff went with him to Worcester, where she drew $4,000 from various banks in which she had accounts and they then drove back to her home where the plaintiff turned over to Sternberg the $4,000 and received in return a receipt therefor in payment for the four thousand shares of class A common stock. Soon afterwards she received by

mail from the defendant a letter acknowledging the receipt of the $4,000 and enclosing a certificate for four thousand shares in the same form as the certificate for the one thousand shares previously bought by her. At the time the plaintiff bought the first one thousand shares she was told by Green that money paid for the shares of stock "would be just like money deposited in a bank or loaned on a mortgage and that she could get her money back from the company at any time she wanted it . . . that at the time she bought the four thousand additional shares Sternberg told her that the company owned a bank, that the investment in the stock would be just like a demand mortgage, that she could draw her money out whenever she wanted it, and that he (Sternberg) was one of the directors of the company." All these statements the judge found were false and were known by the persons who made them to be false, were made with intent to deceive the plaintiff into buying the stock, were relied on by the plaintiff, and had the intended effect. After the plaintiff purchased the stock she received, in 1930, two dividends of $100 each; with these exceptions she has received nothing. It was further found that for the year 1930 the company showed a net loss of over $250,000; that at the time the plaintiff bought the stock it was worth $200, and that if it had been as represented by the defendant's salesman it would have been worth at that time $5,000. When the plaintiff paid Green the $1,000 and when she paid Sternberg the $4,000, she signed in each instance a printed paper entitled "Shareholders Special Subscription" wherein it is recited that "No condition, agreements or representations, written or verbal, other than those printed herein, shall be binding." The trial judge found that when the plaintiff signed these papers they were not explained nor read to her, that when she signed the subscription for the four thousand shares she was hurried into signing it by Sternberg, who professed to be anxious to get away. He further found that, if the language of the subscription agreement means that the plaintiff agreed thereby that she would have no remedy by an action at law for deceit for false representations

made to induce her to sign the subscription agreement and purchase the stock, she did not understand the meaning of the contract and it was not explained to her.

At the close of the evidence the defendant made the following requests for rulings: (1) "On all the evidence as a matter of law, the plaintiff is bound by the provision of the subscription contract to the effect that 'No condition, agreements or representations, written or verbal, other than those printed herein, shall be binding'"; (2) "By reason of the application of the ruling in the first request, the finding should be for the defendant." These requests for rulings were denied subject to the defendant's exception. It was found by the judge that the plaintiff was induced to purchase the stock by false and fraudulent representations made to her by the defendant's agents who were authorized to sell the stock, and he ruled that she is not prevented from recovering damages by having signed the subscriptions. To this ruling the defendant excepted. Damages were assessed in favor of the plaintiff in the sum of $4,800 with interest from the date of the writ amounting altogether to the sum of $5,049.60.

The fraud which is found to have been practised upon the plaintiff consisted in the false representations of the defendant's salesmen that the stock was just like money deposited in a bank, or lent on a mortgage, that she could get her money back from the company at any time she wanted it, that the company owned a bank, and that Sternberg told her he was one of the directors of the company. These were false representations respecting the identity of the property which the plaintiff was told she was purchasing. It is plain that this was a deliberate fraud respecting the contract itself, and entitles the plaintiff to the relief she seeks, notwithstanding the recital in the contract relied on by the defendant. "Fraud which enters into the making of the contract cannot be excluded from the reach of the law by any form of phrase inserted in the contract itself. Parties cannot by written words prevent the law from inquiring into and granting relief for fraud in the substance of the contract. *Butler* v. *Prussian*, 252 Mass.

265, 268.   Many contracts have been refused enforcement whereby a party has striven to shield himself from the results of his fraudulent practices upon the other party. Such contracts, if given validity, would overcome the salutary maxim which pervades the common law, that fraud vitiates every transaction at the election of the injured party."   *Granlund* v. *Saraf,* 263 Mass. 76, 79.   The case is governed by *Butler* v. *Prussian,* 252 Mass. 265, *Hashem* v. *Massachusetts Security Corp.* 255 Mass. 29, *Connelly* v. *Fellsway Motor Mart, Inc.* 270 Mass. 386, 390, 391.

The cases of *Colonial Development Corp.* v. *Bragdon,* 219 Mass. 170, and *Sullivan* v. *Roche,* 257 Mass. 166, cited by the defendant, relate to antecedent fraudulent representations and are distinguishable in their facts from the present case.

*Exceptions overruled.*